# STATE OF MICHIGAN

# COURT OF APPEALS

BUREAU OF HEALTH CARE SERVICES,

        Petitioner-Appellee,

v

JAN H. POL, DVM,

        Respondent-Appellant.

UNPUBLISHED
June 23, 2016

No.   327346
Dep't of Licensing
and Regulatory Affairs
LC No.   14-028081

Before: SAWYER, P.J., and HOEKSTRA and WILDER, JJ.

PER CURIAM.

Respondent, a licensed veterinarian, appeals from a disciplinary action by petitioner. We reverse and remand.

We are presented here with the Curious Case of Mr. Pigglesworth. The case is curious because after Mr. Pigglesworth, a Boston terrier, was struck by a car, his owners rushed him to their family veterinarian, respondent Jan Pol, who successfully saved Mr. Pigglesworth's life and yet was found by petitioner to be negligent and incompetent.

Respondent operates a veterinary practice in Weidman, Michigan. He also has a reality television show on a cable network. One episode featured Dr. Pol's treatment of Mr. Pigglesworth. Mr. Pigglesworth's left eye was out of its socket, he had lacerations to the interior of his mouth, and an x-ray confirmed a fractured pelvis. Dr. Pol indicated that he could treat Mr. Pigglesworth within the owners' budget of $300. Dr. Pol's testimony indicated that Mr. Pigglesworth's owners, who had been his clients for many years, would have to make the decision to euthanize Mr. Pigglesworth if the cost of saving him would be beyond their means. Dr. Pol removed the eye, suturing the eye socket shut, sutured the lacerations of the mouth and determined that the pelvis would be able to heal on its own.

A veterinarian in Kentucky watched the episode which featured Mr. Pigglesworth, took exception with how Dr. Pol treated Mr. Pigglesworth, and filed a complaint with petitioner. After an investigation, petitioner filed an administrative complaint against Dr. Pol. The complaint only specified three factual allegations regarding the alleged mistreatment of Mr. Pigglesworth:

-1-

14. During the above-referenced major surgical procedure, Respondent failed to wear a cap, mask, and gown. Respondent's assistant who placed his hand in Mr. Pigglesworth's mouth, did not wear gloves and also failed to wear a cap, mask, and gown.

15. During the major surgical procedure, Respondent failed to provide I.V. therapy to Mr. Pigglesworth.

16. Following the major surgical procedure, Respondent did not provide a warming pad or blanket to [sic] Mr. Pigglesworth's kennel.

The complaint then sets forth two counts of violating the Public Health Code, MCL 333.16221(a) and MCL 333.16221(b)(i), a violation of either of which would justify the disciplinary subcommittee to take disciplinary action under MCL 333.16226. MCL 333.16221 provides for discipline in a number of circumstances, including the following:

(a) Except as otherwise specifically provided in this section, a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.

* * *

(b) Personal disqualifications, consisting of 1 or more of the following:

(i) Incompetence.

Furthermore, MCL 333.16106(1) defines "incompetence" as follows:

(1) "Incompetence" means a departure from, or failure to conform to, minimal standards of acceptable and prevailing practice for a health profession, whether or not actual injury to an individual occurs.

Following a contested hearing, the hearing officer issued a Proposal For Decision (PFD), which concluded that Dr. Pol violated both provisions and was subject to discipline. Thereafter, the Disciplinary Subcommittee issued an order that accepted the PFD and placed Dr. Pol on probation, fined him and ordered him to take continuing education classes.

MCL 24.306 provides as follows:

(1) Except when a statute or the constitution provides for a different scope of review, the court shall hold unlawful and set aside a decision or order of an agency if substantial rights of the petitioner have been prejudiced because the decision or order is any of the following:

(a) In violation of the constitution or a statute.

(b) In excess of the statutory authority or jurisdiction of the agency.

(c) Made upon unlawful procedure resulting in material prejudice to a party.

(d) Not supported by competent, material and substantial evidence on the whole record.

(e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion.

(f) Affected by other substantial and material error of law.

(2) The court, as appropriate, may affirm, reverse or modify the decision or order or remand the case for further proceedings.

Respondent first argues that he was denied due process because the PFD went outside the scope of the allegations in the complaint. We agree. Early on in the hearing, respondent objected to questions posed to Dr. Pol by petitioner that went outside the specific allegations of the complaint. The hearing officer did rule that due process required petitioner to stay within the factual allegations of the complaint, specifically paragraphs 14, 15, and 16 as quoted above, noting that petitioner could have amended its complaint to add additional allegations, but failed to do so. (H Tr, pp 44-45.) Nonetheless, not only did testimony during the hearing go past those three paragraphs, the PFD does as well and, for that matter, found violations of sections of the Public Health Code not contained in the complaint. This is most clearly demonstrated in the PFD's ultimate conclusion of law:

Because of the failures to adhere to Sections [sic] 16221(a) and Section 16221(b)(i), I find that Dr. Pol is subject to disciplinary action as provided in Section 16221(h) of the Public Health Code.

While the complaint alleged violations of § 16221(a) and (b)(i), it never alleged a violation of § 16221(h).[1] Moreover, the PFD contains numerous factual conclusions that go outside the

---

[1] That section authorizes disciplinary action for a violation "of this article or of a rule promulgated under this article." The complaint does, in its general factual allegations under paragraph 6, make reference to this subsection, but it is not repeated in the actual counts alleged against respondent later in the complaint. The placement of that reference in the complaint, plus the phrasing in the PFD, does suggest the possibility that petitioner and the hearing officer are under the mistaken impression that subsection (h) is a procedural provision rather than a substantive one. But the structure of MCL 333.16221 makes it clear that it is a substantive provision. The introductory paragraph authorizes the disciplinary subcommittee to take action "if it finds that 1 or more of the following grounds exist," which is then followed by a listing of subsections (a) through (t) (many of which have their own multiple subparts), each of which lists a particular violation. But, in any event, because respondent was not charged with a violation of subsection (h), it was improper for the PFD to list that a basis for imposing discipline.

-3-

scope of paragraphs 14 through 16. Those conclusions include references to a failure to x-ray Mr. Pigglesworth's skull and chest (PFD, p 7), the cleaning of the surgical area, the type of anesthesia used, the failure to intubate during surgery, the lack of use of monitoring equipment during surgery, the use of corticosteroids (PFD, p 8), and the procedures used during the taking of x-rays (PFD, pp 8-9).[2] These factual conclusions that fall outside the scope of the allegations contained in the complaint are specifically cited in the PFD as a basis for the decision. (PFD, p 10).

This Court discussed due process requirements in administrative proceedings in *Hardges v Dep't of Social Services*, 177 Mich App 698; 442 NW2d 792 (1989), and we believe that the principles discussed there are equally applicable to this case. In *Hardges*, the petitioner's food stamp assistance was terminated. The reason listed in the termination was that there were more people living in the home than were listed on her application. But after the hearing, the termination decision was upheld by the referee on the basis that the petitioner "had refused to provide information necessary to determine her continued eligibility for food stamps." *Id.* at 701. In reversing, this Court noted that the initial notice from the agency had not cited a failure to cooperate or verify information. *Id.* at 703. In concluding that the petitioner's due process rights were violated, the Court, *id.* at 704, concluded as follows:

> We conclude that the department did not give petitioner adequate notice of the reason for termination of her food stamp assistance. In failing to cite the reason in the notice prior to hearing, the department denied her the opportunity effectively to prepare for and address it. The lack of notice prevented her from obtaining a full and fair hearing and deprived her of her right to due process.

In sum, the hearing officer in this case was correct in his initial ruling: that due process required petitioner to restrict its case to the allegations actually set forth in the complaint. The hearing officer, however, erred by going beyond those allegations in the PFD. And, by extension, the disciplinary subcommittee erred in adopting the PFD despite the due process violations. Accordingly, the decision must be set aside under MCL 24.306(1)(a) because it was rendered in violation of respondent's constitutional right to due process.

Petitioner argues that any error in failing to provide respondent with due process is harmless because, even if only the alleged violations are considered, the record supports the sanctions imposed. Respondent, however, argues that the decision is not supported by competent, material, and substantial evidence on the whole record. We agree with respondent. This Court summarized the standard of reviewing an agency decision on this basis in *Huron*

---

[2] On this point, we are also troubled by the fact that the PFD takes issue with the failure to wear radiation badges during the x-ray, dismissing respondent's testimony that badges were worn on the basis that the hearing officer did not see any badges on the video of the televised program, even though Dr. Pol had testified that the portion on the program showing the x-ray procedure was a reenactment done because the film crew could not be in the x-ray room during an actual x-ray.

*Behavioral Health v Dep't of Community Health*, 293 Mich App 491, 497; 813 NW2d 763 (2011):

> When reviewing whether an agency's decision was supported by competent, material, and substantial evidence on the whole record, a court must review the entire record and not just the portions supporting an agency's findings." *Great Lakes Sales, Inc v State Tax Comm*, 194 Mich App. 271, 280; 486 NW2d 367 (1992). Substantial evidence is what "a reasoning mind would accept as sufficient to support a conclusion." *Dignan v Pub Sch Employees Retirement Bd*, 253 Mich App 571, 576; 659 NW2d 629 (2002). Substantial evidence is "more than a mere scintilla" but less than "a preponderance" of evidence. *Mantei v Pub Sch Employees Retirement Sys*, 256 Mich App 64, 71; 663 NW2d 486 (2003). A reviewing court must not substitute its discretion for that of the administrative tribunal even if the court might have reached a different result. *VanZandt v State Employees' Retirement Sys*, 266 Mich App 579, 584; 701 NW2d 214 (2005).

Initially, we note that we shall limit our review to the allegations contained in the complaint. From a factual perspective, respondent largely admits the factual allegations contained in paragraphs 14 through 16, though denies that they establish a violation of MCL 333.16221(a) and (b)(i). Specifically, respondent's answer to those paragraphs was as follows:

> 14. Dr. Pol admits that he did not wear a cap, gown or mask during the surgery. Dr. Pol's assistant wore no gloves, cap, mask or gown during the surgery. Both Dr. Pol and his assistant properly sanitized their hands prior to the surgery of Mr. Pigglesworth, which meets the standard of care to stop preventable infections.

> 15. Dr. Pol admits that no I.V. therapy was provided. Answering further, based on over 30 years of professional experience, the anesthesia provided was sufficient and properly sedated Mr. Pigglesworth for surgery. The condition of Mr. Pigglesworth and the circumstances of the surgery did not require I.V. therapy.

> 16. Dr. Pol admits that Mr. Pigglesworth was not placed on a warming pad post-surgery, but newspaper and a rubber mat were provided in the kennel and the temperature of the room is maintained between 75 and 80 degrees.

Thus, the question becomes whether these factual allegations establish a breach of the duty of care under MCL 333.16221(a) or incompetence under MCL 333.16221(b)(i). We conclude that they do not.

With respect to the allegations contained in paragraph 14, the PFD makes limited reference to this. In fact, the hearing officer's discussion of this point is both interesting and telling. The only reference to the lack of wearing a gown in the hearing officer's conclusions of law is the following:

In response to inquiries concerning various issues such as a sterile environment for surgery, or proper gowns, Dr. Pol asserted that there was no state law which requires that he be dressed in sterile gown, nor that the area of surgery be sterile. Dr. Pol is correct, there is no state law which mandates his attire during surgery. Dr. Pol maintains that he is able to render service at less cost to his customers. However, the issue is not whether certain functions or acts are directly addressed and forbidden by specific statutes, but rather, whether there is a minimum level of care that must be rendered by a veterinarian. All the parties acknowledge that there is no textbook to consult to determine what must first be done in the event an animal has been hit by a car.

One would expect at this point that the PFD would then establish an authoritative basis for a veterinary standard of care that addresses proper veterinarian attire. But this was not to be as the opinion never returns to that topic. Rather, the next paragraph of the decision addresses the actual lack of any authoritative standard of care in veterinary medicine:

The issue is further complicated by a lack of mandatory continuing education for the veterinary practice. Admittedly, there are abundant guidelines and suggestions by various boards and committees, none which have enforcement powers. The guidelines and suggestions, while not mandatory, do establish practices for the safe and skillful practice of the veterinary medical practice. Those who stay abreast of the advances and adopt the procedures, re-establish the minimum standards. As a result, we have denied barbers the opportunity to cure diseases by the "letting of blood" and no long[er] require an "eye of newt" for prescriptions. The inquiry today involves the practice, conduct, or condition that impairs, or may impair, the ability to safely and skillfully practice the health profession.

Thereafter, the PFD goes on to discuss other issues, making only a brief, general reference to the need for a sterile surgical environment, but without discussing the specifics of a mask, cap and gown.

But it is this last quoted paragraph that we find somewhat telling. First, it acknowledges that there are not, in fact, any established standards of care by an authoritative body. Rather, there are only "guidelines and suggestions" by private, voluntary groups. While these may well be good guidelines and suggestions, it is hardly a basis to establish a statutory violation for a practitioner not to follow them. And, the hearing officer bemoans the fact that there is no mandatory continuing education for veterinarians. Perhaps there should be, but that is not a decision for either this Court or for the hearing officer to make. Indeed, this paragraph of the decision reflects a desire by the hearing officer to do that which neither the Legislature nor the licensing board has chosen to do: to establish formal standards of practice or require continuing education.

Turning to paragraph 15 and the failure to utilize I.V. therapy, the PFD does address this in slightly more detail. First, the PFD makes this reference to the testimony of one of respondent's experts, Dr. Michael McDonald:

Dr. McDonald tendered a proposed exhibit which was submitted to demonstrate the differences in cost to pet owners. (Since "cost" was not alleged in the pleading, the offered exhibit was rejected). It is noteworthy that Dr. McDonald's estimate clearly indicated that he would have used IV therapy, gas anesthesia and pain relief for this dog. As a result, I find that Dr. McDonald's testimony is inconsistent with his proposed actions and not in accord with the acts of Dr. Pol.

What we find inconsistent is the hearing officer's rejecting a proposed exhibit and then utilizing it to declare the witness' testimony to be inconsistent. Moreover, the mere fact that Dr. McDonald would have used IV therapy does not lead to the conclusion that respondent's failure to do so breaches the standard of care.[3] That is, the mere fact that two practioners would utilize different treatment methods does not compel the conclusion that either method is wrong.[4] See *Rytkonen v Lojacono,* 269 Mich 270, 275; 257 NW2d 703 (1934) ("Where there is an opportunity for choice, the doctor is not guilty of negligence in using a method so recognized even though all his local contemporaries may employ another method."). The PFD later makes reference to IV therapy providing hydration and "would have provided additional support and allow the infusion of other drugs if the animal became more stressed during the course of surgery." But these brief references are buried in a paragraph that dealt with issues outside the scope of the complaint, namely what type of anesthesia was utilized. And in the hearing officer's conclusion, he states that he is "convinced that IV therapy is now a standard practice among veterinarians." But that hardly establishes that it was negligent or incompetent to fail to do so in a particular case.

Finally, we turn to paragraph 16 and the lack of a warming pad or blanket in the kennel after surgery. The PFD addresses that allegation as follows:

> The complaint alleged that the standard of care would have required some type of "warmth therapy". Dr. Lathrop stated that anesthesia causes the loss of body temperature which places additional stress on the animal and that such treatment can be rendered at little expense. Dr. Pol, Dr. McDonald and Dr. Kiessling [respondent's other expert witness] all testified that they could tell if an

---

[3] And it is even a stretch to say that the exhibit supports the view that Dr. McDonald would have utilized IV therapy. Rather, the exhibit was a cost estimate of the various procedures and not necessarily an outline of what Dr. McDonald's treatment plan would have been.

[4] We also find it interesting that the hearing officer suddenly limited the evidence to that alleged in the pleading. And we believe that he did so based upon a false premise, namely that cost is an irrelevant factor here as a defense. We believe that cost can be relevant in determining the standard of care in veterinary practice. Mr. Pigglesworth's owners had limited funds available for his treatment, with the clear implication that, if the cost of saving his life would exceed that amount, they would be forced to accept the alternative of euthanasia. We doubt that this is hardly an usual situation in the practice of veterinary medicine; rather, it represents a stark difference between the practice of veterinary medicine and human medicine and, unlike human medicine, must play a role in the decisions made by veterinarians.

animal needed warmth therapy by touching or holding the animal. Dr. Pol did not explain why he took the dog's temperature with a thermometer when it first arrived. Dr.'s [sic] Lathrop and Myer maintain that it is now common standard procedure to provide some means of "warmth therapy", and I find Dr. Lathrop's testimony on the subject as being more reasonable and therefore, more credible.

The PFD fails to establish how a "common standard procedure" equates to a minimum standard of care or competence. And, more importantly, the PFD points to no evidence to establish that Mr. Pigglesworth needed warmth therapy.

Turning to the testimony of petitioner's expert, Dr. Gay Gira-Lathrop, she testified as to her opinion regarding the treatment provided to Mr. Pigglesworth. She testified to a number of things that she believed that respondent should have done, either instead of or in addition to what he did do. She provided the following opinion regarding whether respondent met the standard of care:

> Q. To summarize, Dr. Gira, what was your overall opinion of the care that Dr. Pol provided to Mr. Pigglesworth?
>
> A. The care that Dr. Pol provided was below the minimum standard of current care based on continuing education and continuing education [sic].

Yet, Dr. Gira had previously acknowledged in her testimony that Michigan is the only state which does not require continuing education for veterinarians. Dr. Gira's testimony also reflected her opinion on the standard of care for veterinarians, but she also acknowledged that the recommendations by the Michigan Veterinary Medical Association, nor any other suggested basis for a standard of care, are not standards that Michigan veterinarians are required by law to follow. In fact, she made the following statement during her testimony:

> There's no defined standard of care because they can't document it because it's so precise every—every occurrence has many different applications, so if you list it as standard of care it would by definition be absolute when you published it. It would be a target for people who would want to find loopholes. Standard of care is interpreted as what a reasonable—what a veterinarian would do in a reasonable situation—in the same situation in a reasonable manner. [H Tr, p 115.]

Dr. Pol's testimony reflects that he does participate in continuing education and that he is aware that, in particular circumstances, the items referenced in paragraphs 14 through 16 may be necessary and appropriate. It was his professional judgment, however, that they were not necessary in the treatment of Mr. Pigglesworth given the nature of the procedure, the relatively short length of the procedure, and Mr. Pigglesworth's observed condition both before and after the procedure. Respondent's expert witnesses also testified that, in their opinion, the standard of care does not require that the practices referenced in the complaint are required in every case; they further testified that they did not have a basis to disagree with respondent's professional judgment regarding the necessity of those practices in this case.

Moreover, we find it disturbing that the hearing officer summarily dismissed the testimony of respondent's experts as being "challenged by their unwavering loyalty to their friend." (PFD, p 7.) Yet, the record does not support the conclusion that they are friends of respondent. In fact, Dr. McDonald testified that he only knew respondent from this incident. (Tr, p 235.) And we are unable to find any reference in Dr. Kiessling's testimony regarding his relationship with respondent, if any, either personal or professional. Accordingly, other than the hearing officer's stated disagreement with the testimony (PFD, p 7), the only stated basis for rejecting their testimony is not supported by anything in the record.

While we recognize that the definition of "incompetence" under MCL 333.16106(1) does not require actual injury, we fail to see how the outcome in a particular case can be ignored when the allegations of negligence and incompetence are based upon that single case. Here, respondent treated Mr. Pigglesworth's injuries. Mr. Pigglesworth came through with flying colors and went home the next day. So far as we are aware, he continues to bring great joy to his owners and terror to the local squirrels. As reflected in a letter by his owners contained in the administrative file, they are not upset by the treatment received by Mr. Pigglesworth, but they are rather upset with petitioner's investigation of respondent.

As we said in the beginning, this case is curious. A dog's life is saved, yet the veterinarian faces sanctions. The doctor is alleged to have violated a standard of care that does not exist in any formally adopted standards by a regulatory body, with the opinions of the experts differing as to what the prevailing standard of care is. Furthermore, the hearing officer's opinion spends more time discussing things outside the allegations of the complaint than those things that were alleged. Indeed, the opinion even makes references to the opinion of the Kentucky veterinarian who filed the original complaint, yet did not testify at the hearing and by her own admission her only knowledge of the case is that which was shown in a few minutes of an episode of the television show, which was heavily edited and partially reenacted.

In the final analysis, we cannot conclude that the administrative decision in this case is supported by competent, material and substantial evidence on the whole record. The evidence submitted does not establish a clear standard of care that respondent violated. Indeed, given the numerous references in the PFD that go outside the scope of the allegations in the complaint, references to items not in the record, and the hearing officer's own opinion as to the need for mandatory continuing education and a formal standard of care, it can even be said that the decision is ultimately arbitrary and capricious. MCL 24.306(1)(e). This is not to say that there is not an argument to be made for required continuing education or the adoption of formal standards, or that a different veterinarian would not have approached the treatment of Mr. Pigglesworth differently. But neither can it be said that the record supports a conclusion that Dr. Pol was negligent or incompetent in his successful treatment of Mr. Pigglesworth.

Reversed and remanded with instructions to dismiss the complaint against respondent. Respondent may tax costs. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Joel P. Hoekstra
/s/ Kurtis T. Wilder

-9-